UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| HAROLD MARTIN BREWER, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 18-CV-0326-CVE-CDL |
| | ) |
| SCOTT CROW,[1] | ) |
| | ) |
| Respondent. | ) |

**OPINION AND ORDER**

This matter comes before the Court on a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner Harold Martin Brewer is a prisoner proceeding pro se. He is currently confined in the Lawton Correctional Facility in Lawton, Oklahoma. He challenges the judgment and sentence entered against him in the District Court of Tulsa County, Case No. CF-2014-3984, after a jury found him guilty of first-degree murder and feloniously pointing a weapon. For the reasons discussed below, the Court denies the petition.

Brewer filed the instant petition for writ of habeas corpus (Dkt. # 1), and a brief in support (Dkt. # 2) on June 21, 2018, seeking federal habeas relief on two grounds. First, Brewer claims that his due process rights were violated by the admission into evidence of custodial statements obtained in violation of his privilege against self-incrimination. Second, Brewer claims that his attorney provided ineffective assistance at trial by (1) failing to object at trial to the admission of his

---

[1] Because Brewer is incarcerated at a privately-operated prison, the proper respondent is Scott Crow, Director of the Oklahoma Department of Corrections. See Rule 2(a) Rules Governing Section 2254 Cases in the United States District Courts; Braden v. 30th Judicial Circuit Court of Ky., 410 U.S. 484, 494-95 (1973). The Court therefore substitutes Scott Crow in place of Joe Allbaugh as party respondent. The Clerk of Court shall note this substitution on the record.

inculpatory custodial statements and (2) failing to object to the admission and publication of the crime scene video (State's Exhibit 61) without redaction of an overly prejudicial portion of the video that focused on the deceased. Respondent Scott Crow filed a response (Dkt. # 13) in opposition to the petition, arguing that each claim should be denied on its merits, and Brewer filed a reply brief (Dkt. # 16).

## FACTUAL BACKGROUND[2]

On August 11, 2014, Brewer visited the home of his sister, Janet (Brewer) Myers. Dkt. # 14-3, Tr. Trial vol. 2, at 148 [254], 197 [303], 206 [312]. Myers's son, Robert "Bobby" Campbell, and Campbell's fiancee, Amanda Day, lived with Myers and Myers's boyfriend, Chris Pryor, in Tulsa, Oklahoma. Dkt. # 14-3, Tr. Trial vol. 2, at 148-51 [254-57]. From the late afternoon until about midnight, while Day was at work, Campbell "stayed outside and worked on [his] car," and Brewer, sometimes joined by Myers and Pryor, periodically sat outside talking with Campbell and smoking cigarettes. Dkt. # 14-3, Tr. Trial vol. 2, at 157-58 [263-64], 206 [312], 243 [349], 249 [355]. Possibly around 9:00 or 10:00 p.m., Brewer and Campbell went to QuikTrip for food and drinks. Dkt. # 14-3, Tr. Trial vol. 2, at 159-60 [265-66]. At some point in the evening, Brewer and Pryor sat outside in the front yard and smoked marijuana, sharing "probably one marijuana cigarette." Dkt. # 14-3, Tr. Trial vol. 2, at 160-61 [266-67], 246-47 [352-53]; Dkt. # 16, Pet'r's Reply Br., at 1. Brewer, Pryor, and Campbell all went inside the house around midnight, and Brewer asked Campbell if he could stay the night. Dkt. # 14-3, Tr. Trial vol. 2, at 161-62 [267-68],

---

[2] For consistency, the Court's citations generally refer to the CM/ECF header pagination. However, for citations to the trial transcripts, the Court also provides, in brackets, the original page number from the transcript. Additional relevant facts will be added infra in the discussion section.

250 [356]. Campbell did not object to Brewer staying the night, but he told Brewer that Day might not approve. Dkt. # 14-3, Tr. Trial vol. 2, at 161-62 [267-68].

Day arrived home from work at approximately 2:40 a.m. on the morning of August 12, 2014, and Campbell woke up when Day shut their bedroom door. Dkt. # 14-3, Tr. Trial vol. 2, at 162 [268]. As Day was getting undressed in her bedroom, she asked Campbell how long Brewer had been at the house. Dkt. # 14-3, Tr. Trial vol. 2, at 162 [268]. According to Campbell, Brewer then knocked on the bedroom door and asked Day if she had marijuana. Dkt. # 14-3, Tr. Trial vol. 2, at 162 [268]. Even though she had told Campbell that she had some marijuana, Day told Brewer, through the closed door, that she did not have any and she told Brewer to leave her alone. Dkt. # 14-3, Tr. Trial vol. 2, at 162-63 [268-69]. According to Campbell, Day and Brewer argued through the door because Brewer stated he "can't take no for an answer," and Day accused Brewer of being rude and threatened to hit him if he did not leave. Dkt. # 14-3, Tr. Trial vol. 2, at 163-64 [269-70]. Campbell heard Brewer tell Day that she would "be sorry," and then heard the front door slam. Dkt. # 14-3, Tr. Trial vol. 2, at 164 [270].

When Campbell heard Brewer reenter the residence, he got up and left the bedroom to tell Brewer to leave. Dkt. # 14-3, Tr. Trial vol. 2, at 165 [271]. Campbell saw Brewer holding a shotgun and pacing in the living room. Dkt. # 14-3, Tr. Trial vol. 2, at 165-66 [271-72]. Brewer saw Campbell and pointed the shotgun at him, so Campbell ran back into the bedroom and opened his closet to look for his hunting rifle. Dkt. # 14-3, Tr. Trial vol. 2, at 166-67 [272-73]. By this time Day was standing near the end of the bed, closer to the bedroom door. Dkt. # 14-3, Tr. Trial vol. 2, at 169-70 [275-76]. At trial, Campbell described what happened next stating:

> Whenever I ran back into the room to grab the rifle, and I was reaching for it in the closet and I heard him say, "Bobby, don't do it," then I quit looking for the gun and

3

> came out of the closet to look. And then as I was coming out, he had shot her. And then I seen him -- I seen -- I seen all the -- the blood come up -- just blood went all over the front -- the floor. And then she took a step back and then fell onto the bed. And I just remember yelling, "Baby," and she -- and then I ran out the room to my mom's room and woke them to tell them to call 911. And I came back into the room and then stayed with Amanda, trying --

Dkt. # 14-3, Tr. Trial vol. 2, at 170 [276]. Campbell did not see Day holding any weapons before Brewer shot her. Dkt. # 14-3, Tr. Trial vol. 2, at 171 [277].

The sound of the gunshot woke Myers. Dkt. # 14-3, Tr. Trial vol. 2, at 210 [316]. As she sat up in bed, Myers heard Campbell scream. Dkt. # 14-3, Tr. Trial vol. 2, at 210-11 [316-17]. Myers opened the door to her bedroom, went into the hallway, and saw Brewer heading toward the front door holding a shotgun. Dkt. # 14-3, Tr. Trial vol. 2, at 211-13 [317-19]. Myers grabbed the gun and asked Brewer what he did. Dkt. # 14-3, Tr. Trial vol. 2, at 212-13 [318-19]. Instead of responding, Brewer pushed Myers away and left the house. Dkt. # 14-3, Tr. Trial vol. 2, at 213 [319].

Medical personnel quickly responded to Pryor's 911 call and began treating Day for an "obvious gunshot wound" and severe hemorrhaging. Dkt. # 14-3, Tr. Trial vol. 2, at 118-19 [224-25], 123-26 [229-32], 214 [320]. Day was pronounced dead less than five minutes after medical personnel arrived. Dkt. # 14-3, Tr. Trial vol. 2, at 126 [232]. Law enforcement officers located a shotgun and a knife in the back yard of an abandoned residence just north of Myers's residence. Dkt. # 14-3, Tr. Trial vol. 2, at 142-43 [248-49]. Later that morning, a patrol officer saw Brewer walking down the street, arrested him, and transported him to the detective division. Dkt. # 14-4, Tr. Trial vol. 3, at 9-11 [378-80].

During a custodial interview with two detectives, Brewer stated that one or two weeks before the shooting, Day had told Brewer that Brewer's daughter had accused Day of molesting Brewer's

4

grandchildren and Day told Brewer that his daughter's accusations might make her "not safe." Dkt. # 15, State's Ex. 62, at 10:01-10:10.[3] He also told detectives that he heard from someone that Day killed someone and made Brewer's daughter watch the killing. Dkt. #15, State's Ex. 62, at 10:11-10:13. Brewer stated that Day pulled a knife on him when she returned home from work on the morning of the shooting and that he knocked the knife out of Day's hand and put the knife in his pocket. Dkt. # 15, State's Ex. 62, at 10:17-10:19. After telling detectives that Day threatened him with a knife, Brewer stated, "that's probably all I should say, man." Dkt. # 15, State's Ex. 62, at 10:20. One detective immediately urged Brewer to continue telling his side of the story. Dkt. # 15, State's Ex. 62, at 10:20-10:21. Brewer continued talking after a brief period of silence. Dkt. # 15, State's Ex. 62, at 10:20-10:21.[4]

According to Brewer, Day then ran to the bathroom after threatening him with a knife, so he retrieved his shotgun from the living room, near the fish tank, and sat down on the couch. Dkt. # 15, State's Ex. 62, at 10:21-10:24, 10:31-32. Brewer again mumbled that he "should probably stop talking." Dkt. # 15, State's Ex. 62, at 10:24. Detectives asked further questions, and Brewer then stated that he heard Day run from the bathroom to her bedroom. Dkt. # 15, State's Ex. 62, at 10:24-10:26. Believing that Day might retrieve Campbell's rifle from the bedroom, Brewer walked to the bedroom and pushed open the door. Dkt. # 15, State's Ex. 62, at 10:26-10:27, 10:36-10:37, 10:43. Brewer stated that he saw Day getting a rifle out of the closet and bringing it around in his direction,

---

[3] State's Exhibit 62 is a DVD depicting the redacted version of the audio and video recorded custodial interview. The Court's citations refer to the approximate times reflected in the internal clock of the recording.

[4] Brewer sat silently with his head down for several portions of the interview as the detectives repeatedly encouraged him to provide his version of the events that led to Day's shooting. Dkt. # 15, State's Ex. 62, generally.

5

with her finger on the trigger, so he shot Day and then left the house.  Dkt. # 15, State's Ex. 62, at 10:27-10:28, 10:35-10:36, 10:44-10:45, 10:59.  According to Brewer, before he shot Day, Campbell moved as if to get in front of Day or to grab the rifle out of her hands, and Brewer said, "don't Bobby," because he did not want to shoot Campbell.  Dkt. # 15, State's Ex. 62, at 10:45-10:47, 10:50-10:53, 10:59-11:00.  As he was leaving the house, Brewer saw Myers and Pryor, and Myers hit his arm.  Dkt. # 15, State's Ex. 62, at 10:28-10:30.  Brewer also told detectives that he threw the shotgun over a fence, but he did not know what happened to the kitchen knife he had placed in his back pocket.  Dkt. # 15, State's Ex. 62, at 10:30-10:33, 10:37-10:38.

## PROCEDURAL BACKGROUND

After a trial, a jury found Brewer guilty of first-degree murder, in violation of OKLA. STAT. tit. 21, § 701.7, and feloniously pointing a firearm, in violation of OKLA. STAT. tit. 21, § 1289.16.  Dkt. # 14-7, Original Record ("O.R."), at 171, 175.  On April 25, 2016, the trial judge sentenced Brewer to life in prison with the possibility of parole, as to the murder conviction, and 10 years' imprisonment, as to the firearm conviction, and ordered the sentences to run concurrently.  Dkt. # 14-7, O.R., at 171,175.

With assistance of counsel, Brewer filed a direct appeal to the Oklahoma Criminal Court of Appeals, raising the same two claims on which he seeks federal habeas relief.  Dkt. # 13-1, at 11-15.  In an unpublished summary opinion filed November 16, 2017, the OCCA affirmed the trial court's judgment and sentence.  Dkt. # 13-4, at 1.  As to Brewer's first claim, the OCCA found that Brewer failed to properly preserve the issue for appeal by failing to make "contemporaneous objections to the admission of these statements at trial."  Dkt. # 13-4, at 2.  Applying plain-error review, the OCCA determined that Brewer's statement during the custodial interview, "that's probably all I

should say, man," was not "an unequivocal request to remain silent." Dkt. # 13-4, at 2-3. As to the second claim, the OCCA found that trial counsel did not perform deficiently by failing to object to the admission of Brewer's custodial statements and that counsel's failure to object to the admission of the crime scene video did not result in any prejudice. Dkt. # 13-4, at 3-4.

Brewer, proceeding pro se, subsequently sought post-conviction relief in the trial court. Dkt. # 13-5. The trial court denied relief, finding that the issues Brewer raised in his application for post-conviction relief were identical to the issues he raised on direct appeal to the OCCA. Dkt. # 13-7, at 3. Under the doctrine of res judicata, the trial court found the issues were procedurally barred. Dkt. # 13-7, at 3. The OCCA affirmed the trial court's denial of post-conviction relief on res judicata grounds. Dkt. # 13-9.

## STANDARD OF REVIEW

Federal district courts have jurisdiction to hear claims from state prisoners that their convictions were obtained in violation of the United States Constitution. 28 U.S.C. §§ 2241, 2254. Before filing a federal habeas petition, a prisoner must exhaust available state court remedies by fairly presenting each claim raised in a petition for writ of habeas corpus to the courts in the state of conviction. 28 U.S.C. § 2254(b); Grant v. Royal, 886 F.3d 874, 890-91 (10th Cir. 2018). State courts are first granted "the opportunity to correct alleged violations" of constitutional magnitude before those claims may be heard in federal court. Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam). The purpose of habeas review is to provide a "guard against extreme malfunctions in the state criminal justice systems," Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring), not to provide "a substitute for ordinary error correction" that a state prisoner may obtain "through appeal" in state court, Harrington v. Richter, 562 U.S. 86, 102 (2011).

If a prisoner has fully exhausted each federal claim in state court, and the state court has adjudicated each claim on the merits, the petition for writ of habeas corpus will be granted only if the state court's adjudication of the claim–

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), a federal habeas court will first analyze whether federal law "was clearly established by the Supreme Court at the time of the state court judgment." Byrd v. Workman, 645 F.3d 1159, 1165 (10th Cir. 2011). A state court's judgment is "contrary to" federal law where "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." Byrd, 645 F.3d at 1165 (quoting Gipson v. Jordan, 376 F.3d 1193, 1196 (10th Cir. 2004)). An unreasonable application of federal law occurs where the state court identifies the proper controlling legal principle but "unreasonably applies" the law to the facts of the defendant's case. Id. Section 2254(d)(2) focuses on the factual underpinnings of the state court's decision. "A state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'" Wood v. Carpenter, 907 F.3d 1279, 1289 (10th Cir. 2018) (alterations in original) (quoting Byrd, 645 F.3d at 1170-72).

## DISCUSSION AND ANALYSIS

**Ground I:  Violation of Brewer's constitutional right against self-incrimination**

Brewer alleges that inculpatory statements he made during a custodial interview were admitted at trial, in violation of his Fifth Amendment right against self-incrimination. At the beginning of the custodial interview, Brewer signed a written form, waiving his right to remain silent and his right to counsel. Dkt. # 14-6, at 64; Dkt. # 15, State's Ex. 62, at 9:35-9:40. Approximately forty-five minutes into the interview, Brewer stated, "that's probably all I should say, man." Dkt. # 13-4, at 3; Dkt. # 15, State's Ex. 62, at 10:20-10:21. Brewer claims that by continuing to question him after he made this statement, the interviewing detectives violated his Fifth Amendment right against self-incrimination and, as a result, the trial court erroneously admitted at trial incriminating statements he made after he said, "that's probably all I should say, man." Dkt. # 1, at 5; Dkt. # 2, at 12-13.

Brewer raised this claim on direct appeal. Applying plain-error review based on Brewer's failure to contemporaneously object to the admission of his statements at trial, the OCCA found no error. The OCCA reasoned,

> Prior to trial, Brewer filed a motion to suppress on the grounds that he did not waive his rights after being read the <u>Miranda</u> warning. At trial, however, when the statement (exhibit 62) was proffered for introduction, defense counsel stated that [s]he had no objection to the introduction of the statement. The trial court ruled that the recorded statement will be "admitted by agreement." On appeal, Brewer complains that a statement which occurred approximately forty-five (45) minutes into the interrogation was an unambiguous invocation of the right to remain silent. The statement was "that's probably all I should say, man."
> We find that Brewer did not make an unequivocal request to remain silent. <u>See</u> <u>Marshall v. State</u>, 1998 OK CR 30, ¶ 8, 963 P.2d 1, 5. Viewing the entire colloquy between Brewer and the investigator would not lead a reasonable person in the belief that Brewer's statement was unequivocal. <u>Parker v. State</u>, 1996 OK CR 19, ¶ 10, 917 F.2d 980, 984. The admission of his entire statement, therefore, did not amount to error. Thus the first hurdle in the plain error analysis is not met and this proposition must fail.

Dkt. # 13-4, at 2-3 (footnote omitted).

In Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), the Supreme Court set forth the now ubiquitous standard that, before a criminal suspect in custody may be interrogated by law enforcement, the suspect must be advised of his right to remain silent and his right to an attorney, regardless of his ability to afford one. The basis for the Miranda decision was the recognition of the Fifth Amendment right that a criminal suspect may not be compelled to incriminate himself. Id. at 439. Inherent in this right is a criminal suspect's ability "to cut off questioning" at any time after it has begun by invoking the right to remain silent or requesting an attorney. Michigan v. Mosley, 423 U.S. 96, 100-01 (1975) (quoting Miranda, 384 U.S. at 473-74). When law enforcement officers violate these mandates, any subsequent confessions or incriminating statements will be inadmissible at trial. Mosley, 423 U.S. at 100-03. The Mosley Court emphasized that law enforcement officers must "scrupulously honor[]" a suspect's right to cut off questioning. Id. at 104.

Over time, however the Supreme Court has established limits and contours to these Fifth Amendment rights, focusing, variously, on the nature of the right to protect against compulsory self-incrimination, as opposed to the mechanical incantation thereof. See, e.g., Berghuis v. Thompkins, 560 U.S. 370, 384 (2010) (gathering cases and discussing conditions that are sufficient to show Miranda waiver is knowing and voluntary); Moran v. Burbine, 475 U.S. 412, 424 (1986) (stating that "Miranda warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the [suspect's] right against compulsory self-incrimination [is] protected" (alterations in original) (quoting New York v. Quarles, 467 U.S. 649, 654 (1984))).

Most recently, the Supreme Court has focused on the need for a criminal suspect to "affirmatively" and "unambiguously" invoke his Fifth Amendment rights. See Thompkins, 560 U.S. at 381 (noting that suspect's invocation of right to remain silent must be "unambiguous"); cf. Davis

10

v. United States, 512 U.S. 452, 461 (1994) (explaining that suspect must "affirmatively invoke[]" the right to have counsel present for custodial interview). In Thompkins, the Supreme Court held that ambiguous or equivocal statements regarding the right to cut off questioning are insufficient to invoke the Fifth Amendment protection. 560 U.S. at 381-82. The Supreme Court has also held that the Fifth Amendment privilege "generally is not self-executing." Salinas v. Texas, 570 U.S. 178, 181 (2013) (quoting Minnesota v. Murphy, 465 U.S. 420, 425 (1984)). This means that a defendant "who 'desires the protection of the privilege must claim it' at the time he relies on it." Salinas, 570 U.S. at 183 (quoting Murphy, 465 U.S. at 427).

Applying these legal principles, the OCCA determined that Brewer's statement "that's probably all I should say, man," was not an unequivocal invocation of his Fifth Amendment right to cease questioning. Dkt. # 13-4, at 2-3.[5] As the OCCA correctly identified the legal principles governing Brewer's Fifth Amendment claim, Brewer cannot show that the decision was contrary to clearly established federal law. Nor can he show that the OCCA unreasonably applied that law. The habeas statutes impose a "highly deferential standard for evaluating state court rulings." Byrd, 645 F.3d at 1166 (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). A federal court "reviewing a state court's application of federal law [is] precluded from issuing the writ simply because" the federal court "conclude[s] . . . that the state court applied the law erroneously or incorrectly." Byrd, 645 F.3d at 1166 (quoting McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003)). Instead, the

---

[5] The OCCA's analysis of this claim referred to Miranda, but did not discuss the other Supreme Court cases cited herein. Regardless, a state court need not mention, or even be aware of, governing Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). The OCCA's reasoning and result are consistent with, and therefore do not contradict, the governing cases.

federal court must find the state court's application of the law was "objectively unreasonable." Id. Given the deference this Court must give to the OCCA's decision, the undisputed language of the statement Brewer relies on to support his purported invocation of his right to remain silent, and the Supreme Court's holdings requiring invocations of the Fifth Amendment right to remain silent be affirmative, unambiguous, and unequivocal, the Court cannot find that the OCCA's decision involved an unreasonable application of clearly established Supreme Court precedent. Section 2254(d)(1) therefore bars relief.

Whether § 2254(d)(2) bars relief is a closer question. Having closely reviewed the trial transcripts, it appears that State's Exhibit 62, the redacted version of the recorded interview, was admitted at trial without objection. Dkt. # 14-4, Tr. Trial vol. 3, at 89-94 [458-63], 134 [503]. However, before the recorded interview was published to the jury, trial counsel clarified that she "misspoke" when she stated she had no objection to the admission of the redacted recorded interview and then stated "I'm simply reurging all of my prior objections to the admission of this statement." Dkt. # 14-4, Tr. Trial vol. 3, at 135 [504]. Even assuming that the OCCA misapprehended the record when it found that Brewer's inculpatory statements were admitted by agreement or without a contemporaneous objection, that misapprehension does not undermine the OCCA's decision as to Brewer's ground one claim. Critically, it is not clear how the OCCA would have reached a different conclusion if it had determined that trial counsel properly preserved for appellate review the challenge to the admission of his inculpatory statements. The OCCA recognized Brewer's challenge as one asserting that he invoked his right to remain silent during the interview before making inculpatory statements, and the OCCA determined that no error occurred in admitting those statements because the statement to which he cited demonstrates the invocation

of his right to remain silent was ambiguous and equivocal. The OCCA's determination, at the first step of its plain-error review, that no error occurred was therefore not driven by the fact that it reviewed Brewer's Fifth Amendment claim for plain error. Thus, the OCCA's ultimate decision —that the statements were not admitted in violation of Brewer's Fifth Amendment right against self-incrimination—is objectively reasonable even if the OCCA may have applied an incorrect standard of appellate review to reach that decision based on its apparent misunderstanding of the record.

For these reasons, the Court denies the petition as to Brewer's ground one claim.

**Ground II:  Violation of Brewer's Sixth Amendment right to the assistance of counsel.**

Brewer claims that he was denied his Sixth Amendment right to the effective assistance of counsel because his attorney (1) failed to object at trial to the admission of the inculpatory statements Brewer made during a custodial interview after he purportedly invoked his right to remain silent (as alleged in his ground one claim), and (2) failed to object at trial to the admission of the crime scene video that was not redacted to exclude what he describes as a prejudicial view of the deceased victim. Dkt. # 2, at 14-16.

Brewer raised this same ineffective-assistance-of-counsel claim on direct appeal, and the OCCA rejected it. Applying Strickland v. Washington, 466 U.S. 668 (1984), the OCCA reasoned,

> Brewer first claims that counsel was ineffective for failing to properly preserve any error in the introduction of his recorded statement. Trial counsel actually agreed to the admission of Brewer's recorded statement. In doing so, Brewer's theory of defense was presented to the jury without Brewer's testimony. The admission of the statement was Brewer's avenue of bolstering his theory of the defense, thus trial counsel['s] assent to the introduction of the statement was a valid strategic decision and cannot amount to ineffective assistance of counsel. See Snow v. State, OK CR 39 ¶ 9, 876 P.2d 291, 295, citing Strickland v. Washington, 466 U.S. 668, 694 (1984).

13

Dkt. # 13-4, at 3-4. Addressing Brewer's second allegation regarding trial counsel's performance, the OCCA reasoned that Brewer failed to show any prejudice, stating,

> Brewer next complains that counsel was ineffective for failing to object to the introduction of the crime scene video which, he claims, focused unnecessarily on the deceased victim for an extended period of time. Brewer's complaint focuses on forty-five seconds when the camera scans the victim and focuses on her face. This [c]ourt cannot say that this portion of the video affected the outcome of this trial in any manner. Thus, Brewer has not met the prejudice prong of Strickland. Brewer's ineffective assistance of counsel proposition must fail.

Dkt. # 13-4, at 4.

In Strickland, the Supreme Court established a two-pronged standard for analyzing claims of ineffective assistance of counsel. First, the defendant must demonstrate that his attorney's performance was deficient. Strickland, 466 U.S. at 687. Second, the defendant must demonstrate that his attorney's deficient performance prejudiced his defense. Id. Under the first prong, a defendant must show that his attorney's conduct fell below "an objective standard of reasonableness." Id. at 688. Because there are myriad methods for "provid[ing] effective assistance in any given case," a reviewing court presumes that counsel's conduct falls within the acceptable range of reasonable professional assistance. Id. at 689. To overcome this presumption, a defendant must show the alleged error could not be considered "sound trial strategy." Id. Even if a defendant demonstrates an objective attorney error, there is no constitutional violation unless he also shows that he was prejudiced by the error. Id. at 687. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The Strickland Court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id. Because both prongs of Strickland must be met to make out an ineffective assistance of counsel claim, "a

14

failure to prove either one is dispositive." United States v. Orange, 447 F.3d 792, 797 (10th Cir. 2006).

Because the OCCA correctly identified Strickland as providing the clearly established federal law governing his ineffective-assistance-of-counsel claim, Brewer fails to show that the OCCA's decision on that claim was contrary to clearly established Supreme Court precedent. Having considered the OCCA's decision in light of the state-court record, the Court further finds that Brewer cannot demonstrate that the OCCA applied Strickland in an unreasonable manner. "Even under de novo review, the standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at 105. And "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Id. This is so because, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." Id. Rather, "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Here, there are several reasonable arguments that counsel did so. First, as to Brewer's claim that his attorney performed deficiently by failing to object to the introduction of his inculpatory statements, the OCCA reasoned that counsel made a strategic decision to allow those statements to come in at trial because those statements were supportive of Brewer's theory of defense. Dkt. # 13-4, at 3-4; see also Dkt. # 2, at 11 (discussing Brewer's statements to detectives); Dkt. # 13, at 15 (discussing theory of defense). This reasoning is suspect because, as previously discussed, the record shows that counsel did object at trial to the admission of Brewer's statements to detectives. Dkt. # 14-4, Tr. Trial vol. 3, at 135 [504]. Nonetheless, having reviewed the recorded interview, the Court finds that it was objectively reasonable for the OCCA to determine (based on its

15

misunderstanding about the lack of a contemporaneous objection) that counsel's performance did not fall outside "the wide range of reasonable professional assistance," Strickland, 446 U.S. at 689, because Brewer made several statements during the interview suggesting that he shot Day in self-defense. The record therefore supports the OCCA's decision, if not the OCCA's reasoning, on this point. Second, as Crow contends, before finding that counsel did not perform deficiently by the alleged lack of objection to the admission of Brewer's inculpatory statements, the OCCA had already determined that Brewer's inculpatory statements were not erroneously admitted because he did not unequivocally invoke his right to remain silent. Dkt. # 13, at 16. While the OCCA did not identify this as a basis to reject Brewer's claim that counsel performed deficiently, this presents another reasonable argument to support the OCCA's rejection of the Sixth Amendment claim. Third, as to Brewer's claim that his attorney performed deficiently by failing to object to the admission of the unredacted crime scene video, the OCCA reasoned that Brewer could not establish the requisite prejudice arising from his attorney's alleged error because the view of Day's body was not overly prejudicial. Dkt. # 13-4, at 4. Having reviewed the crime scene video, the Court finds the OCCA's decision objectively reasonable. Dkt. # 15, State's Ex. 61, generally. Further, as Crow contends, the evidence at trial included testimony from one witness who saw Brewer shoot Day with a shotgun and the admission of Brewer's own recorded statements admitting that he shot Day with a shotgun. Dkt. # 13, at 8, 11, 17. The brief view of Day's body, as seen in the video, is arguably less prejudicial than the visual images individual jurors may have conjured in their own minds after hearing that Brewer shot Day in the chest with a shotgun at fairly close range. Under these circumstances, it was objectively reasonable for the OCCA to find no reasonable probability of a different outcome for Brewer's trial, had counsel objected to the admission and publication of the

unredacted crime scene video. Based on the foregoing, the Court cannot say that the OCCA unreasonably applied Strickland when it rejected Brewer's ineffective-assistance-of-counsel claim. The Court therefore finds that § 2254(d)(1) bars relief as to the ground two claim.

As with the ground one claim, whether § 2254(d)(2) bars relief presents a closer question based on the OCCA's misstatement of the record regarding trial counsel's alleged failure to object to the admission of Brewer's inculpatory statements. However, even assuming this misstatement demonstrates that the OCCA's decision is based on an unreasonable determination of the facts, and thus warrants de novo review of Brewer's Sixth Amendment claim, that claim fails. As discussed, the record shows that counsel did, in fact, object at trial to the admission of those statements. Thus, Brewer's allegation of ineffectiveness on this ground as has no factual basis at all.

For these reasons, the Court denies the petition as to Brewer's ground two claim.

## CONCLUSION

In summary, Brewer has not shown that he is in custody in violation of the Constitution. The Court therefore denies the petition for writ of habeas corpus. Further, because Brewer has not shown that reasonable jurists would debate this Court's assessment of his constitutional claims, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253; Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall note on the record the substitution of Scott Crow, Director of the Oklahoma Department of Corrections, in place of Joe Allbaugh, as party respondent.

2. The petition for writ of habeas corpus (Dkt. # 1) is **denied**.

3. A certificate of appealability is **denied**.

4. A separate judgment shall be entered in this matter.

**DATED** this 15th day of October, 2021.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE